**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DANIEL A. LOPEZ,    )
   Petitioner,    )  Civil Action No. 12-97 Erie
          )
   v.       )  Senior District Judge Maurice B. Cohill
          )  Magistrate Judge Susan Paradise Baxter
ROBERT COLLINS, <u>et</u> <u>al.</u>,  )
   Respondents.   )


### <u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

## I. <u>RECOMMENDATION</u>

It is respectfully recommended that the petition for a writ of habeas corpus be denied and that a certificate of appealability be denied.


## II. <u>REPORT</u>[1]

### A. **Relevant Background**

On December 14, 2007, the Petitioner, Daniel Lopez, and two unidentified males walked up the steps to Michael Kinney's apartment, which was on the second floor of a building located at 918 West 29th Street in Erie, Pennsylvania. Kinney heard them, opened his apartment door and encountered Lopez, who was an acquaintance of his. One of the unidentified males grabbed Kinney and forced him by gun point back into his apartment. The other unidentified male also entered the apartment. The two unidentified males robbed Kinney and his cousin, Steve Joint. Kinney's sister, Cassie, happened to approach Kinney's apartment as the crimes were occurring. She also knew Lopez, and he almost ran into her as she was entering the stairwell to Kinney's apartment.

---

[1] Respondents have submitted the Common Pleas Court's file and relevant transcripts. The documents in the Common Pleas Court's file are indexed and numbered 1 through 42. They shall be cited to as "CP Dkt. No. __ ."

The police were unable to apprehend the two unidentified males, but they eventually tracked down Lopez and charged him as a conspirator and as an accomplice with several crimes relating to what occurred that night. On September 8, 2008, he was tried in the Court of Common Pleas of Erie County on one count of Criminal Conspiracy to Commit Robbery; one count of Robbery; and, three counts of Recklessly Endangering Another Person. Assistant Public Defender Matthew Porsch, Esq., represented Lopez.

Lopez contends that the evidence introduced at his trial was insufficient to support his robbery conviction. The crux of his claim is that the trial court and Commonwealth misstated the testimony given by an individual named Joel Burlingame; that the Superior Court adopted their inaccurate version of the evidence; and, that as a result the Super Court denied Lopez's insufficiency of the evidence claim on direct appeal. In order to evaluate Lopez's argument, a detailed summarization of the relevant trial testimony is required.

Michael Kinney testified that he lived in the upstairs unit of a two-apartment home, and that to get to the door of his apartment you had to enter from a door in the back of the house and then walk up a flight of stairs. (9/8/08 Trial Tr. at 50-53). He testified that he and his cousin, Steve Joint, were in his apartment in the early evening hours of December 14, 2007. (<u>Id.</u> at 53-54). Kinney said that he knew Lopez but had not seen him for "at least a couple of years" prior to that evening. (<u>Id.</u> at 55-56).

Kinney described how the robbery started:

A.     Okay. Like I said, I was sitting there playing with my pets trying to make sure they were getting along, and then I heard, like, some commotion, like banging, maybe yelling from downstairs, and it could have been coming from outside or the hallway, I wasn't sure. So I then opened my door and I go out into the hallway to see what's going on. And then when I get to the top of the stairs, I see Dan and what I thought to be one other person walking up my stairs, and – do you want me to keep going?

Q.     Yeah.

2

A.    And then Dan, as soon as I make eye contact with Dan, he says, "Where's Chuy?" and Chuy is another mutual friend that he had back in – back probably two years ago[.]

- - -

Q.    Did you know what the defendant meant when he said, "Where's Chuy?"

A.    No, I did not.

Q.    Okay. And it was the defendant who was on your stairwell?

A.    Yes.

Q.    All right. You said you saw at that point what you believed to be one person behind the defendant?

A.    Yes.

- - -

He was a black male.

Q.    Okay. What happened then after the defendant asked you, "Where is Chuy?"

A.    He said, "Where's Chuy?" and then it kind of threw me for a loop, and I told him that Chuy's never around here. Like, Chuy's never around my house. He doesn't know where I live and I went to kind of turn around towards my door, and they must have kept walking up because when I turned back around, that's when the gun got flashed in my face.

Q.    Okay. Now, in terms of the order on the stairwell, you said you only saw two –

The Court:    Who was in front and who was behind?

A.    Danny Lopez was leading and the other black male was behind him.

Q.    Okay. And then at some point in time did you discover there was a second black male?

A.    Yes, I did.

Q.    When was that?

A.    That was right when I turned around and had the gun put in my face.

(Id. at 56-59).

3

Kinney explained that by that time he was near "the threshold" of his apartment, one of the unidentified males was holding him with a gun pointed towards his back, and Lopez was behind both unidentified males. (Id. at 59-60). He testified that when the first unidentified male pulled the gun on him, Lopez still was very close to them ("maybe a half a foot at most."). (Id. at 63-64). Kinney stated that Lopez did not say anything as the first unidentified male guided Kinney at gunpoint back into his apartment. (Id. at 61). He testified that he did not observe Lopez come into his apartment but that: "[Lopez] definitely didn't run right when I got turned around. Like, I got turned around and then after that, I didn't know what was going on behind me. They walked me into my bedroom and then – no, I don't know if he ran." (Id. at 64).

Kinney testified that he was "on [his] knees in [his] bedroom doorway with the gun to [his] back when" Joint walked out of the bathroom "right into what was going on." (Id. at 62). The second unidentified male forced Joint onto a loveseat in the living room. (Id. at 63). Kinney stated that the unidentified males took money from him and from Joint. They also took their phones and several video game systems that Kinney owned. (Id. at 65).

Kinney further testified that as the robbery was happening his sister Cassie arrived at his apartment and she became "hysterical." (Id. at 66-67). One of the unidentified males grabbed her and forced her to sit on the couch across from Joint and told her "to stay put." (Id. at 67).

Kinney stated that after the unidentified males exited his apartment, he, Joint, and Cassie waited a few minutes and then ran outside. There, they encountered Joel Burlingame, who was the valet at Colao's, which is a restaurant located nearby. (Id. at 69-70). Kinney testified that they asked Burlingame if he had seen anyone and Burlingame stated to them that "he actually just seen three guys just running down around the corner down Plum." (Id. at 70).

Steve Joint testified and he described what happened when he exited the bathroom. (Id. at 105-13). In relevant part, Joint stated that after the two unidentified males left the apartment, he, Kinney, and Cassie ran outside and saw Burlingame. Joint testified that Burlingame told them that he saw "three gentlemen with a duffel bag" going "north on Plum." (Id. at 114. See also id. at 137).

Cassie testified about walking towards her brother's apartment that evening. She explained that Lopez, whom she had known for about five years, "was opening the door from the inside as I was opening it to enter into the apartment, the hallway." (Id. at 144) He almost ran into her and she said: "Damn, excuse me, Danny[.]" (Id.) She then "walked up the stairs" and thought "what was he doing there[?]" (Id.) On cross-examination, Cassie stated that when she ran into Lopez "[h]e had his arms up like this and just looked frantic." (Id. at 153-54). She said he looked scared and did not yell or signal to the individuals upstairs. (Id. at 154). Cassie further testified: "I didn't see if he went right or left down the driveway or where he went after that, but I know he was outside." (Id.)

Joel Burlingame testified that on the evening of December 14, 2007, he was employed as a valet for Colao's restaurant, which was located on the corner of 29th and Plum Streets in Erie and is "[j]ust a few houses down" from Kinney's apartment. (Id. at 29, 38). Burlingame explained that in doing his job, he would greet customers in front of the restaurant, "get their car, hang a right and park it in the elementary parking lot down the street," and then come back to the restaurant. (Id. at 28-29).

During his direct examination by the prosecutor, Burlingame, who did not know any of the individuals involved, stated that that evening, about five minutes before 7:00 p.m., he was approached by three people (presumably Kinney, Joint, and Cassie) who "asked if [he] had seen individuals leaving the area." (Id. at 30). Burlingame told them that he had seen "guys leave" the area and that "[t]hey were walking up the street." (Id.) He testified that he had seen the same men about ten minutes beforehand

and "they were walking the opposite direction from which they were going the second time I saw them." (Id. at 31).

The prosecutor asked Burlingame if he remembered how many individuals he saw leaving Kinney's apartment and he replied: "I remember seeing two for sure. I don't remember when or if I saw the third one." (Id. at 32). The following exchange then occurred:

Q.     Mr. Burlingame, you said that you were talking to police that night, correct?

A.     Yes.

Q.     All right. Can we agree that your memory on the night in question about these events would be better than it is today for instance?

A.     Yes, sir.

Q.     All right. Do you remember telling police – a police officer that you observed three individuals fitting a description that was given leaving that area?

A.     I don't remember my statement. Certainly, if that's what I said, that's the way it was.

Q.     Okay. What I'd like to do is to show you what I'll mark for identification purposes as Commonwealth Exhibit Number 1, and I'll ask you to take a look. Mr. Burlingame, at the bracketed area on that.

A.     Okay.

Q.     All right. And just read that to yourself.

A.     All right.

Q.     All right. And can we agree that – I'll take that back. Thanks. Can we agree that at least as the police have written it down, it would appear you told them you saw three individuals leaving that area, correct?

A.     Yes.

Q.     Do you have any reason to doubt the police report?

A.     No, sir.

> Q.  Any reason to believe that the officer heard you wrong, that you said two, but he wrote down three instead?
>
> A.  No.

(Id. at 35-36).[2]

On cross-examination, defense counsel asked Burlingame what his "recollection today" was "about the people you saw?" (Id. at 37). Burlingame stated: "I remember three going in and I had, by accident, confronted two as they were leaving, that I remember." (Id.) He continued to explain that he first saw the three men when "[t]hey were walking right by Colao's front door" and were about "five feet" from him. (Id. at 38). Burlingame testified that one of the individuals was walking about five to ten feet behind the other two but "[i]t was clear to [him] that these gentlemen knew who each other were." (Id. at 40).

Defense counsel then inquired about when Burlingame next saw the three men. At this point, the following exchange occurred:

> Q.  Now, when was the next time that you saw these individuals?
>
> A.  Maybe five, ten minutes later.
>
> Q.  Now – and, again, you said the second time you saw them there was only two individuals you saw; is that correct?
>
> A.  That I remember right now. I do certainly remember approaching the two by accident. I do not remember at this time whether the third gentleman was already ahead of them.

---

[2]    After Burlingame stepped down, the trial court instructed the jury:

Ladies and gentlemen, in this case you've just seen witnesses [sic] shown a statement that the police took down at an earlier time. That's not evidence. The question is, did that help the witness' recollection? The evidence is what he remembers or testifies to here under oath. These other things do not have evidentiary significance. They're available to try to refresh recollection, but nothing more.

(9/8/08 Trial Tr. at 48).

Q.    Now, when you say by accident, can you explain to the jury what you mean by that?

A.    Oh, sure. I just parked a car at the elementary parking lot and I was jogging back, you know. It's a good portion of a block. It's a nice residential area. The blocks are kind of long. So I was jogging back so, you know, not to miss any customers, and I was approaching two of the gentlemen from behind as I was jogging. And one gentleman, you know, he heard me coming and he had turned around and he was extremely startled with my presence, so that's how I can say it was an accident.

                    - - -

Q.    And, again, it's your recollection that you only saw two individuals at this point in time?

A.    Yes.

                    - - -

Q.    After you had parked the car, did some people come up and talk to you about a robbery?

A.    Oh, yes.

Q.    Do you remember what they said to you?

A.    Did you – did you see – they may or may not have mentioned race or skin color. They asked if I saw – they may have specified the number three, did I see these people leaving, you know, walking up the street.

Q.    So they specifically asked you if you saw three individuals?

A.    Yes.

Q.    Okay. Now, what did you reply to them?

A.    I said, yes, I saw them just a few minutes ago.

Q.    But you only had seen – you had seen three people walking towards the home, but you only saw two people walking away; is that correct?

A.    Well, if they asked me three and I told them, yes, that meant three.

Q.    But today – I mean, this is important. That night you only saw two people walking away from that home?

A.    I can't say what I saw that night because it's a year later.

8

(Id. at 40-43).

Burlingame later testified:

I do remember that I believe I saw the third gentleman that I may – that I'm saying that I might not remember, see, he actually had left. He went the similar direction as the two that I approached by accident. I believe he actually left a significant amount of time before I even saw them because he was walking by himself ahead of the other two.

(Id. at 44). Burlingame clarified that he thought he saw the third individual exit the scene on foot about five to ten minutes after he initially had seen all three men walking in the direction of Kinney's apartment. (Id. at 45). "About three minutes" after he saw that man, he saw the other two individuals walking away from the scene. (Id.)

On redirect examination, Burlingame stated again that he first saw three individuals walking in the direction of Kinney's apartment. The following exchange then occurred:

Q.    All right. They're the same three individuals that you see leaving that area, correct?

A.    Yes.

Q.    Okay. What you're saying is you recall perhaps today that one might have been a couple of minutes ahead of the other two?

A.    Yeah.

Q.    Okay. Now, did you tell the police that you saw people with bags?

A.    Yes.

Q.    All right. Who had the bags?

A.    The two gentlemen that I approached when I was jogging back to Colao's.

Q.    Okay. And those were – those two gentlemen were going in the same direction as the one that you say today you think left a little bit sooner than them, correct?

A.    Yes.

9

Q.     And is it fair that some of this stuff is – when I say stuff, I mean, events or facts that you're remembering, some of it's clearer than other things?

A.     Well, sure.

(Id. at 47-48).

The last witness to testify was Detective Sergeant John Holmes with the City of Erie Police Department. He was assigned to investigate the robbery a day or two after it occurred. (Id. at 168). He interviewed each of the victims and they "identified [Lopez] by name[.]" (Id. at 169). Det. Sgt. Holmes testified that he had not been able to identify or locate the two males that were with Lopez the night of the incident. (Id. at 178). He stated that he did attempt to contact Burlingame "with negative results." (Id. See also id. at 175-78).

Det. Sgt. Holmes eventually located and interviewed Lopez on January 21, 2008. He testified that Lopez told him that he went to Kinney's apartment to purchase marijuana. (Id. at 179). Lopez also told Det. Sgt. Holmes that:

> … he had gone to Mr. Kinney's apartment and upon walking up the stairs, he spoke with Mr. Kinney briefly and had two black males from behind go past him and enter Mr. Kinney's apartment. He indicated to me that he thought something was going to happen. I think that's his exact words. So he left. He didn't want to get involved or have any trouble and walked out of the apartment.

(Id. at 171). Lopez also said to Det. Sgt. Holmes that "he really didn't know anything else" (id.) and that he left the scene "in his girlfriend's car and didn't report this incident to anyone … because, basically, he didn't want to get involved or have any trouble." (Id. at 172).

The prosecution rested its case after Det. Sgt. Holmes testified and the defense did not call any witnesses. In his closing statement, defense counsel noted that it was not in dispute that Lopez was one of three men that came to Kinney's apartment door on the evening of December 14, 2007. (9/9/08 Trial Tr. at 5). He emphasized, however, that it was not a crime for Lopez to merely be present at the scene.

Defense counsel highlighted those portions of Burlingame's and Cassie's testimony that supported a finding that Lopez left the scene of the crime well before the two unidentified males. (Id. at 6-7). He argued that that evidence – when considered together with the testimony of Kinney and Joint, which did not support a finding that Lopez was a principal actor in the robbery – created reasonable doubt that Lopez was a conspirator or accomplice in the crimes committed that evening. (Id. at 6-22).

In his closing statement, the prosecutor argued that Lopez's job in the robbery was to be the "lookout." He also reminded the jurors that Burlingame was nervous when he testified and was trying to recall events that had happened some time ago. The prosecutor stressed that Burlingame testified that what he told the police the night of the robbery (that he saw three exit the area around Kinney's apartment), would be a more reliable account than his recollection at trial. (Id. at 26-27). However, the prosecutor argued, even if Burlingame in fact had observed one individual leaving the scene on foot earlier than the other two, that did not mean that Lopez was not an accomplice in the crimes that were committed in Kinney's apartment. After all, the prosecutor argued, Kinney knew Lopez and, therefore, Lopez was able to take the other two individuals to Kinney's apartment and get him to open the door for them. The prosecutor proposed to the jurors that during the commission of the robbery and as Lopez was acting as the "lookout," Lopez heard Cassie approach the scene. He panicked, which caused him to run down the stairs and past Cassie as she was about to enter the stairwell to Kinney's apartment. (Id. at 27-39).

The jury found Lopez guilty of Robbery and of three counts of Recklessly Endangering Another Person. It was hung on the count of Criminal Conspiracy to Commit Robbery.

On October 29, 2008, the trial court sentenced Lopez to a term of 120-240 months on the Robbery conviction and imposed concurrent sentences for each of the counts of Recklessly Endangering

Another Person. The Commonwealth filed a motion for leave to enter *nolle prosequi* on the count of

Criminal Conspiracy to Commit Robbery, which the court granted. (CP Dkt. No. 14).

Lopez, through Nicole Sloane, Esq., Chief, Appellate Division with the Office of the Public

Defender, filed a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b) in

which the following two claims were raised:

1.   [Lopez] is serving an illegal sentence for Recklessly Endangering Another Person because the crime of Recklessly Endangering Another Person merges into Robbery.

2.   There was insufficient evidence to convict Defendant of Robbery and three counts of Recklessly Endangering Another Person. There was no evidence that Defendant directly committed the crimes because he never threatened the victims, placed them in fear, committed or threatened to commit a felony, or physically removed property from the victims. Further, there was insufficient evidence to convict [Lopez] under accomplice liability because the Commonwealth failed to prove [Lopez] had a shared intent with the principal actors to commit the crimes.

(CP Dkt. No. 22 at 2 (footnote omitted)).

In its Rule 1925(b) Opinion, the trial court stated that Lopez's convictions should be upheld. It

summarized the evidence introduced at Lopez's trial as follows:

The testimony elicited at Trial established that on December 14, 2007, victims Michael Kinney, and his cousin, Steven Joint, arrived at Kinney's home at 918 West 29th Street in the City of Erie after returning from a trip to Greenville. A side door located near the rear driveway of the home provided access to Kinney's apartment. A set of approximately 20 stairs led to a landing with another door that provided entrance to the victim's second floor apartment.

At approximately 6 o'clock in the evening, the victims were in the apartment settling in from their trip. While the victim Joint was in the restroom, victim Kinney heard a commotion on the steps leading to his apartment. When he looked down the stairs he saw Defendant Lopez whom he testified he knew, but had not seen in a few years. Directly behind Lopez, he saw another individual – a black male – also walking up the stairs to his apartment. By the time Defendant Lopez and the first unknown black male had reached the top of the landing, victim Kinney testified that he noticed a second black male. One of the black males put a gun in his face. He testified that Defendant Lopez was approximately a half a foot from the perpetrator who held the gun on him. He did not know either of the black males. He testified that one black male grabbed him by the back

12

of his shirt and held the gun to his left shoulder and ushered him into his apartment. The victim was forced into his bedroom and onto his knees and money was demanded.

At some point, the second victim Joint returned from the bathroom and encountered the other black male who sat him on the couch in the living room. After demanding money from the victims, both black males began disconnecting various video game equipment throughout the apartment and placing it in a duffle bag. Victim Joint testified that the second black male threatened to stab him with scissors if he didn't cooperate. It was during this time of the robbery that victim #3, Kinney's sister, Cassie Kinney, walked into the apartment and happened upon the ensuing robbery. She testified that when she initially arrived at the apartment, she encountered the Defendant Lopez opening the door from the bottom stairwell as she was opening it to get into the apartment and that they "ran into each other." The victim, Cassie Kinney, testified that Defendant Lopez looked startled upon seeing her. She also testified that although she was acquainted with Lopez, she had not seen him for quite a while. All of the victims denied having invited Defendant Lopez to Kinney's home and expressed their belief he was involved in the robbery.

In addition to the victims' testimony, the charging and investigating officers, **as well as a doorman of a local restaurant [Burlingame], all established that three men went into the apartment and three men left the apartment together**.

(CP Dkt. No. 23, <u>Commonwealth v. Lopez</u>, No. 693 of 2008, slip op. at 1-2 (C.P. Erie, Mar. 6, 2009)

(emphasis added)).

Regarding Lopez's argument that there was insufficient evidence to support his convictions, the

trial court set forth the well-established law governing such claims (<u>id.</u> at 3) and then stated:

Here, Defendant Lopez attacks the sufficiency of the evidence, but his argument fails to concede the inferences, all favorable to the Commonwealth, that the jury was free to properly draw from Defendant Lopez's unexplained nighttime arrival with two accomplices who proceeded to rob the victims. The unity of action in arrival and in flight served to underscore that Defendant Lopez acted as an accomplice in the Robbery. The suggestion that Defendant Lopez was merely present and was the victim of an ill timed arrival and departure was rejected by the jury – and they had more than ample cause to reject this argument, incredible on its face. Defendant Lopez was a classic accomplice and the fact that Defendant Lopez's accomplices were left to do the heavy work of intimidation affords no basis to set aside the jury's verdict. The fact that the jury did not convict of conspiracy affords no basis to attack an otherwise proper verdict.

(<u>Id.</u> at 3-4).

Attorney Sloane submitted the brief on Lopez's behalf to the Superior Court of Pennsylvania. She highlighted the evidence most favorable to Lopez, including that portion of Burlingame's testimony that supported the position that Lopez had excited the scene of the crime well ahead of the two unidentified males, and argued:

> [T]here was insufficient evidence to convict him as an accomplice to robbery. Pursuant to Commonwealth v. Barnes, 871 A.2d 812, 822 (Pa.Super.Ct. 2005), a criminal defendant who was not a principal actor in committing the crime, may be liable for the crime if he was an accomplice of a principal actor. An individual is found to be an accomplice of a principal if with the intent of promoting or facilitating the commission of the offense, he: (i) solicited the principal to commit it; or (ii) aided or agreed or attempted to aid such other person in planning or committing it. Barnes, 871 A.2d at 822. In other words, to be an "accomplice" there must be evidence that the defendant intended to aid or promote the underlying offense and that the defendant actively participated in the crime by soliciting, aiding, or agreeing to aid the principal. Id.
>
> However, a defendant cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. Id. Rather, there must be some additional evidence that the defendant intended to aid in the commission of the underlying crime, and then did or attempted to do so. Id.
>
> Additionally, a person is guilty of robbery if, in the course of committing a theft, he … inflicts serious bodily injury upon another or threatens another with or intentionally puts him in fear of immediate serious bodily injury. 18 Pa.C.S.A. § 3701(a)(1)(i) and (ii).
>
> During Lopez' trial, there was no evidence that Lopez intended to aid in the commission of the robbery and then did or attempted to do so. Indeed, testimony revealed that when Lopez was leaving the victim's apartment prior to the robbery, Lopez appeared "scared" and "frantic." J.T. at pp. 153-154. Lopez was never seen walking with or talking to the robbers as he walked to the apartment several steps behind the robbers. Further, he was never observed communicating with them. Additionally, the jury was hung on the charge of Conspiracy to [Commit] Robbery demonstrating the prosecution's failure to present sufficient evidence to support a conviction for conspiracy.

(ECF No. 19-1, Brief for Appellant, Commonwealth v. Lopez, No. 2087 WDA 2008, at 4, 8-9 (Pa.Super. May 19, 2009)).

Assistant District Attorney Christine Fuhrman Konzel, Esq., filed the brief for the Commonwealth. In it, she stated that Burlingame "testified that all three men went into the apartment

14

and out of the apartment together, running from the place." (CP Dkt. No. 28B (Ex. 6), Brief for Appellee, <u>Commonwealth v. Lopez</u>, No. 2087 WDA 2008, at 1 (Pa.Super. July 20, 2009)).

On December 16, 2009, the Superior Court issued a Memorandum. It agreed with Lopez that his convictions for recklessly endangering another person should have merged into the sentence for robbery. Therefore, it vacated the judgments of sentences Lopez received on the three counts of recklessly endangering another person. (CP Dkt. No. 24, Lopez, No. 2087 WDA 2008, slip op. at 4-5).

The Superior Court also held that "the evidence was sufficient to support Lopez's conviction of robbery as an accomplice.[3] (CP Dkt. No. 24, <u>Commonwealth v. Lopez</u>, No. 2087 WDA 2008, slip op. at 8 (Pa.Super. Dec. 16, 2009)). It repeated in full the trial court's summarization of the evidence admitted at the trial and adopted that court's reasoning for denying Lopez's claim that there was insufficient evidence to support his robbery conviction. (<u>Id.</u> at 1-3, 7-8). It also added:

> Our standard of review of a challenge to the sufficiency of the evidence is:
>
> whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.* Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon

---

[3] The Superior Court determined that Lopez had waived any argument that there was insufficient evidence to support his convictions of recklessly endangering another person. However, it agreed with him that his three convictions for that crime should have merged into the sentence for robbery. Therefore, it vacated the judgments of sentences Lopez received on the three counts of recklessly endangering another person. (CP Dkt. No. 24, <u>Lopez</u>, No. 2087 WDA 2008, slip op. at 4-5, 6 n.2).

the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Commonwealth v. Troy, 832 A.2d 1089, 1092 (Pa.Super. 2003) (citations omitted) (emphasis added).

"A person is an accomplice of another person in the commission of an offense if:"

(1)    with the intent of promoting or facilitating the commission of the offense, he:

    (i)    solicits such other person to commit it; or

    (ii)    aids or agrees or attempts to aid such other person in planning or committing it; or

(2)    his conduct is expressly declared by law to establish his complicity.

18 Pa.C.S.A. § 306(c).

After reviewing the record, we conclude that Lopez's contention lacks merit. We adopt the reasoning of the trial court in this regard[.]

- - -

We note also that the record shows that victim Michael Kinney knew Lopez prior to the incident in this case. N.T., 9/8/08, at 55. On the day of the incident, Kinney was in his apartment when he heard a commotion from downstairs. Id. at 57. Kinney opened the door to his apartment and went out into the hallway to see what was going on. Id. Kinney saw Lopez and a black man walking up the stairs to his apartment. Id. When Kinney made eye contact with Lopez, Lopez said, "Where's Chuy?" Id. Kinney indicated that Chuy was a person both he and Lopez had known a few years prior to that date. Id. Kinney told Lopez that Chuy was "never around here." Id. at 58. Kinney then turned to walk back into his apartment. Id. As he did so, a gun was pointed at his face, and Kinney noticed that another black man was present. Id. at 59. The robbery then proceeded, as indicated in the above-stated facts of the case.

Based on the above, we conclude that the evidence was sufficient to support Lopez's conviction as an accomplice in robbery.

(Id. at 6-8 (emphasis and bracketed text in original)).

On or around March 7, 2011, Lopez filed a *pro se* motion under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.* (CP Dkt. No. 28). He argued once again that the

evidence was insufficient to convict him and that his direct appeal counsel (Attorney Sloane) was ineffective in the manner in which she litigated the claim. The court appointed William J. Hathaway, Esquire, to represent Lopez. Hathaway filed a supplement to the PCRA motion in which it was requested that Lopez's direct appeal rights be reinstated *nunc pro tunc* so that the sufficiency of the evidence claim could be revaluated by the Superior Court. (CP Dkt. No. 30).

The PCRA court dismissed Lopez's request for PCRA relief without a hearing. (CP Dkt. Nos. at 31-32). Lopez, through Hathaway, filed an appeal with the Superior Court. He raised one claim: that Lopez "was afforded ineffective assistance of counsel in that defense counsel undermined the challenge to the sufficiency of the evidence claim on direct appeal in failing to challenge the Commonwealth's and the trial court's reference to and assessment of the testimony of Joel Burlingame[.]" (ECF No. 19, Brief for Appellant in Commonwealth v. Lopez, No. 1409 WDA 2011, at 3-4 (Pa.Super., Nov. 1, 2011)). In support of this claim, Lopez argued that Burlingame was "the main witness to testify against him" and that both the trial court and the Commonwealth cited his testimony in support of the proposition that "three men went into [Kinney's] apartment and three men left the apartment together." (Id. at 5). Lopez asserted that "this conclusion is not fairly derived from the actual trial record." (Id.) He further argued that because the Superior Court "recited and incorporated the factual findings of the trial court including this specific reference[,]" his appeal was prejudiced. (Id.) Lopez averred "that he was afforded ineffective assistance of counsel in that appellate counsel failed to address or seek to countermand the efficacy of these findings through argument on appeal thereby depriving him of an adjudication of the sufficiency of the evidence claim on that merits of that claim." (Id.) He also argued that "Burlingame's testimony was fundamentally sketchy[,]" and "[g]iven that the Commonwealth and lower Court both recited factual conclusions as to his testimony, which were overstated, [Lopez] was prejudiced." (Id. at 6).

On February 3, 2012, the Superior Court issued a Memorandum in which it affirmed the PCRA court's decision to deny post-conviction relief. It held:

> The law presumes counsel has rendered effective assistance. Commonwealth v. Williams, 597 Pa. 109, 950 A.2d 294 (2008). When asserting a claim of ineffective assistance of counsel, the petitioner is required to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and, (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. Commonwealth v. Kimball, 555 Pa. 299, 724 A.2d 326 (1999). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. Williams, supra. "The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit…." Commonwealth v. Pierce, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994). "Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." Commonwealth v. Poplawski, 852 A.2d 323, 327 (Pa.Super. 2004).
>
> "When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as the verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt." Commonwealth v. Mann, 820 A.2d 788, 793 (Pa.Super. 2003), appeal denied, 574 Pa. 759, 831 A.2d 599 (2003) (citing Commonwealth v. Drumheller, 570 Pa. 117, 808 A.2d 893, 907-908 (2002)).
>
> Instantly, Appellant frames his issue on appeal as one involving appellate counsel's ineffectiveness for inadequately challenging the sufficiency of the evidence on direct appeal. In reality, however, Appellant's contentions raise a weight claim because they implicate appellate counsel's alleged failure to debate the jury's credibility determinations regarding Mr. Burlingame's testimony. In any event, his hybrid argument fails because it entirely ignores the relevant standard of review and instead focuses only on the evidence that favors him, and views that evidence in the light most favorable to himself. Appellant cannot simply parse out the evidence presented at trial, exclude one part of it (Mr. Burlingame's testimony) as deficient and defying rational belief, and then conclude the "remainder" of the evidence is insufficient to support his conviction. Appellant's contentions boil down to nothing more than a complaint that the jury chose to disbelieve his view of the facts, and that appellate counsel was ineffective for failing to make that argument. A verdict, however, is not against either the sufficiency or weight of the evidence merely because the jury chose to believe the Commonwealth's version of the events rather than Appellant's. See Commonwealth v. Emler, 903 A.2d 1273, 1276 (Pa.Super. 2006) (outlining relevant standard of review and observing fact-finder is free to believe all, part or none of the evidence). Appellate counsel, therefore, cannot be deemed ineffective for failing to challenge the jury's decision to accept Mr. Burlingame's testimony.

(CP Dkt. No. 40, <u>Commonwealth v. Lopez</u>, No. 1409 WDA 2011, slip op. at 5-8 (Pa.Super. Feb. 3, 2012)).

Lopez now seeks relief from his judgment of sentence from this Court. He has filed a petition for a writ of habeas corpus under the federal statute applicable to state prisoners, which is 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA"). In his petition [ECF No. 7], he raises the two claims that he brought in his appeals to the Superior Court: that there was insufficient evidence to support his robbery conviction and that his direct appeal counsel was ineffective in litigating that claim. Lopez also brings two due process that he did not raise in either of his appeals to the Superior Court. He contends that his due process rights were violated: (a) because the trial court and the Commonwealth "falsified" Burlingame's trial testimony; and, (b) "when the trial court judge read [the] prosecutor's version of criminal charges with instructions and prior to deliberation." [ECF No. 7 at 8, 10].

Respondents have filed the state court record and an answer to the petition [ECF No. 15], to which Lopez has filed a reply [ECF No. 17].

### B. Discussion

#### 1. Lopez's claims that there was insufficient evidence to support the jury's verdict and that his direct appeal counsel was ineffective

##### (a) Standard of Review

Because the Superior Court denied Lopez's first two claims on the merits, this Court's analysis of them is governed by AEDPA's standard of review, which is codified at 28 U.S.C. § 2254(d). AEDPA "imposes a highly deferential standard for reviewing claims of legal error by state courts[.]" <u>Burt v. Titlow</u>, — S.Ct. — , 2013 WL 5904117, *4 (Nov. 5, 2013). It provides, in relevant part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or *involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States*[.]

(Emphasis added).

The Third Circuit Court has explained:

The test for § 2254(d)(1)'s "contrary to" clause is whether the state court decision "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams v. Taylor, 529 U.S. 362, 405 (2000), and Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)). Of course, a state court's resolution of a question that the Supreme Court has not resolved can be neither contrary to, nor an unreasonable application of, the Court's precedent. See Kane v. Garcia Espitia, 546 U.S. 9 (2005).

Rountree v. Balicki, 640 F.3d 530, 537 (3d Cir. 2011) (bracketed text in original) (parallel citations omitted).

Since most state court decisions evaluating ineffective assistance or insufficiency of the evidence claims can easily pass the test for § 2254(d)(1)'s "contrary to" clause, the key evaluation in the vast majority of such cases is made under § 2254(d)(1)'s "unreasonable application of" clause.

The test for § 2254(d)(1)'s "unreasonable application of" clause is as follows: "[a]n 'unreasonable application' occurs when a state court 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Rompilla v. Beard, 545 U.S. 374, 380 (2005) (quoting Wiggins v. Smith, 539 U.S. 510, 519, 520 (2003)). For purposes of § 2254(d)(1), "[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (internal quotations omitted). "Under § 2254(d)(1)'s 'unreasonable application' clause ... a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 75-76, 123 S.Ct. 1166 (quoting Williams v. Taylor, 529 U.S. 362, 411 (2000)). Rather, "[t]he state court's

20

application of clearly established law must be objectively unreasonable" before a federal court may grant the writ. <u>Andrade</u>, 538 U.S. at 75.

<u>Rountree</u>, 640 F.3d at 537 (parallel citations omitted).

The Supreme Court repeatedly has stressed the "highly deferential" review that this Court must accord the state court's adjudication in conducting an analysis under § 2254(d)'s "unreasonable application" clause:

> We have explained that "an unreasonable application of federal law is different from an incorrect application of federal law." <u>Williams v. Taylor</u>, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." <u>Id.</u>, at 411, 120 S.Ct. 1495. Rather, that application must be "objectively unreasonable." <u>Id.</u>, at 409, 120 S.Ct. 1495. This distinction creates "a substantially higher threshold" for obtaining relief than <i>de novo</i> review. <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," <u>Lindh v. Murphy</u>, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and "demands that state-court decisions be given the benefit of the doubt," <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).

<u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010). <u>See</u> <u>also</u> <u>Harrington v. Richter</u>, — U.S. —, 131 S.Ct. 770, 786 (2011) ("If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings…. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther."). The Supreme Court emphasized that same theme in its decision <u>Burt v. Titlow</u>:

> AEDPA recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights. "[T]he States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause. Under this system of dual sovereignty, we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." <u>Tafflin v. Levitt</u>, 493 U.S. 455, 458, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990). This principle applies to claimed violations of constitutional, as well as statutory, rights. <u>See</u> <u>Trainor v.</u>

Hernandez, 431 U.S. 434, 443, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977). Indeed, "state courts have the solemn responsibility equally with the federal courts to safeguard constitutional rights," and this Court has refused to sanction any decision that would "reflec[t] negatively upon [a] state court's ability to do so." Ibid. (internal quotation marks omitted)….

Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error ... beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. —, — 131 S.Ct. 770, 786-787, 178 L.Ed.2d 624 (2011). "If this standard is difficult to meet" – and it is – "that is because it was meant to be." Id., at —, 131 S.Ct., at 786. We will not lightly conclude that a State's criminal justice system has experienced the "extreme malfunctio[n]" for which federal habeas relief is the remedy. Id., at —, 131 S.Ct., at 786 (internal quotation marks omitted).

Burt, — S.Ct. at — , 2013 WL 5904117 at *4.

**(b)    Insufficient evidence claim**

The "clearly established Federal law," 28 U.S.C. § 2254(d)(1), in which to analyze Lopez's claim that there was insufficient evidence to support the jury's verdict is set forth in Jackson v. Virginia, 443 U.S. 307 (1979). "The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt" of each element of the offense. Id. at 309. Under Jackson, evidence is sufficient to support a conviction if, "after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, — U.S. — , 132 S.Ct. 2060, 2064 (2012) (*per curiam*) (quoting Jackson, 443 U.S. at 319).

22

In rejecting Lopez's insufficiency of the evidence claim, the Superior Court applied the Pennsylvania equivalent of the Jackson standard. (CP Dkt. No. 24, Lopez, No. 2087 WDA 2008, slip op. at 6-7). See also Evans v. Court of Common Pleas, Delaware Cnty., 959 F.2d 1227, 1233 (3d Cir. 1992) (the test for insufficiency of the evidence is the same under both Pennsylvania and federal law). Because the Superior Court applied the correct legal standard, its adjudication satisfies review under the "contrary to" clause of § 2254(d)(1). See, e.g., Williams, 529 U.S. at 406. Therefore, the only remaining question for this Court to decide is whether its decision was an "unreasonable application of" Jackson. The Supreme Court has made clear that:

> Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury … to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the [trial court's] verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the [trial court]." Cavazos v. Smith, 565 U.S. 1, __ (2011) (per curiam) (slip op., at 1). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Ibid. (quoting Renico v. Lett, 559 U.S. __, __ (2010) (slip op., at 5)).
>
> - - -
>
> [T]he only question under Jackson is whether [the state court's] finding was so insupportable as to fall below the threshold of bare rationality. The state court of last review did not think so, and that determination in turn is entitled to considerable deference under AEDPA, 28 U.S.C. § 2254(d).

Coleman, 132 S.Ct. at 2062, 2065.

There is no basis for this Court to conclude that the Superior Court's decision to deny Lopez's claim that there was insufficient evidence to support his robbery conviction was an "unreasonable application of" Jackson. 28 U.S.C. § 2254(d). Lopez insists that the trial court in its Rule 1925(b) Opinion, the Commonwealth in its direct appeal brief, and the Superior Court in the Memorandum it issued on direct appeal "misstated" and "overstated" Burlingame's testimony. They did not. What they did was recite the *facts in the light most favorable to the prosecution*, which is precisely the way in

which the facts should be recounted by them when evaluating a claim of insufficiency of the evidence. See Jackson, 443 U.S. at 319. None of them misstated the evidence. The victims' testimony established that Lopez approached Kinney's apartment with two other individuals, and that evidence was so strong that defense counsel conceded that Lopez was there. Although Burlingame testified that it was his recollection at the time of the trial that he saw one individual exit the area near Kinney's apartment before the other two, he acknowledged that he told the police the night of the incident that he saw three individuals leaving the area. He agreed with the prosecutor that his recollection of the events would have been stronger at the time he spoke with the police the night the robbery had occurred. (9/8/08 Trial Tr. at 32-36). Although the jury could have determined after listening to Burlingame's testimony that Lopez left the scene before the other two individuals, the *most favorable view* of the evidence was that all three men left the scene together.

Lopez also overstates the importance of Burlingame's testimony when he claims that Burlingame was the prosecution's main witness. The victims knew Lopez and their testimony alone placed him outside of Kinney's apartment with the principal actors in the robbery. Their testimony also established that the two individuals that were with Lopez forced Kinney back into his apartment at gunpoint and robbed them. Certainly there was sufficient evidence from the victims' testimony alone from which the jury could have concluded, as the prosecutor argued, that at the very least Lopez was the "lookout," and that he fled the scene early because he panicked when he heard Cassie get out of her car and approach the steps to Kinney's apartment.

Lopez cannot accept that he was convicted even though there was no dispute at his trial that he was not one of the two individuals that entered Kinney's apartment and robbed Kinney and Joint at gunpoint. But, as the state court held, there was sufficient evidence introduced at his trial to convict him

as an accomplice, and that makes him as responsible for the robbery committed as are the two

unidentified men he brought to Kinney's apartment the night of December 14, 2007.

In conclusion, this Court, which must give "considerable deference under AEDPA," to the

Superior Court's adjudication of this same claim, <u>Coleman</u>, 132 S.Ct. at 2065, cannot grant Lopez relief

under the circumstances presented here. Therefore, it is recommended that Lopez's claim that there was

insufficient evidence to support his robbery conviction must be denied.

### (c)    Ineffective assistance of counsel

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment

guarantees a defendant the effective assistance of counsel on a first direct appeal as of right. <u>See</u> <u>Evitts</u>

<u>v. Lucey</u>, 469 U.S. 387 (1985). The "clearly established Federal law" for AEDPA purposes in which to

analyze Lopez's claim that his direct appeal counsel, Attorney Sloane, was ineffective in the manner in

which she litigated the claim of that there was insufficient evidence to support his convictions is set

forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>Lewis v. Johnson</u>, 359 F.3d 646, 656 (3d Cir.

2004) (claims of ineffective assistance of appellate counsel are evaluated under the <u>Strickland</u> standard).

Under <u>Strickland</u>, Lopez must show that his Attorney Sloane's representation fell below an

objective standard of reasonableness. 466 U.S. at 688; <u>see</u> <u>also</u> <u>Williams</u>, 529 U.S. at 390-91. The law

presumes that she were effective:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too
> tempting for a defendant to second-guess counsel's assistance after conviction or adverse
> sentence, and it is all too easy for a court, examining counsel's defense after it has proved
> unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable.
> A fair assessment of attorney performance requires that every effort be made to eliminate
> the distorting effects of hindsight, to reconstruct the circumstances of counsel's
> challenged conduct, and to evaluate the conduct from counsel's perspective at the time.
> Because of the difficulties inherent in making the evaluation, a court must indulge a
> strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Id. at 689 (internal citations and quotations omitted).

Strickland also requires that Lopez demonstrate that he was prejudiced by his counsel's alleged deficient performance. When a petitioner is contending that his appellate counsel was ineffective, he must show that there is a reasonable probability that, but for counsel's alleged ineffectiveness, the appellate court would have reversed his judgment of sentence. Id. at 694. See also United States v. Mannino, 212 F.3d 835, 844 (3d Cir. 2000).

The Superior Court applied the correct legal standard when it evaluated this claim. (CP Dkt. No. 40, Lopez, 1409 WDA 2011, slip op. at 5-6). See also Commonwealth v. Kimball, 724 A.2d 326 (Pa. 1999) (the legal standard for evaluating ineffective assistance claims in a PCRA proceeding is the same as the federal Strickland standard). Therefore, its adjudication passes federal habeas review under the "contrary to" clause of § 2254(d)(1). See, e.g., Williams, 529 U.S. at 406.

The only question left for this Court to address is whether the Superior Court's adjudication was an "unreasonable application of" Strickland. 28 U.S.C. § 2254(d). In conducting this analysis, the Court is mindful of two points made by the Supreme Court. The first is that:

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland, 466 U.S.] at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [Knowles v. Mirzayance, 556 U.S. at —, 129 S.Ct. 1411, 1420 (2009)]. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at —, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Harrington, 131 S.Ct. at 788 (emphasis added). The second is that AEDPA and Strickland "do not permit federal judges to … casually second-guess the decisions of their state-court colleagues or defense attorneys[.]" Burt, — S.Ct. at — , 2013 WL 5904117 at 2. "[W]here a case involves such a common claim as ineffective assistance of counsel under Strickland – a claim state courts have now adjudicated in countless criminal cases for nearly 30 years –'there is no intrinsic reason why the fact that a man [or woman] is a federal judge should make him [or her] more competent, or conscientious, or learned ... than his [or her] neighbor in the state courthouse.'" Id. at *4 (quoting Stone v. Powell, 428 U.S. 465, 494, n.35 (1976)).

Lopez contends that Attorney Sloane was ineffective because she did not argue to the Superior Court that the trial court in its Rule 1925(b) opinion and the Commonwealth in its appellate brief made statements that "were in serious contradiction" to the testimony given by Burlingame. [ECF No. 7 at 7]. This argument has no merit. As explained above, there was nothing improper about the way the trial court and the Commonwealth summarized the evidence introduced at trial.

In addition, Attorney Sloane presented an objectively reasonable argument to the Superior Court when she litigated this claim. She attempted to focus the court's attention on what evidence there was from which the jury could have concluded that Lopez was not an accomplice to the crime, including highlighting that portion of Burlingame's testimony that supported the position that Lopez had excited the scene of the crime well ahead of the two unidentified males. Attorney Sloane also argued that Lopez could not be convicted as an accomplice simply based on evidence that he knew about the crime or was present at the scene, and cited to case law to support this argument.

That the Superior Court rejected the merits of Lopez's sufficiency of the evidence claim certainly was not the result of ineffective assistance on Attorney Sloane's part. In any event, the only issue before

this Court is whether the Superior Court's decision to deny this ineffectiveness claim was an "unreasonable application of" Strickland. 28 U.S.C. § 2254(d). It was not.

Based upon all of the foregoing, Lopez's claim that he received ineffective assistance of counsel in his direct appeal must be denied.

### 2.    Lopez's remaining due process claims

Lopez contends that his due process rights were violated "when the trial court judge read [the] prosecutor's version of criminal charges with instructions and prior to deliberation." He also contends that his due process rights were violated because the trial court and the Commonwealth "falsified" Burlingame's trial testimony. [ECF No. 7 at 8, 10]. The latter claim can be denied on the merits because its premise is incorrect, as the record establishes that neither the trial court nor the Commonwealth "falsified" the evidence introduced at Lopez trial when it summarized the evidence in the light most favorable to the Commonwealth.

In addition, both claims can be denied because Lopez did not exhaust them in the state court, and, therefore, he has procedurally defaulted them. The exhaustion requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991). See also O'Sullivan v. Boerckel, 526 U.S. 838, 842-49 (1999). The requirement is:

> principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. See Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 490-491, 93 S.Ct. 1123, 1127, 35 L.Ed.2d 443 (1973). Under our federal system, the federal and state "courts [are] equally bound to guard and protect rights secured by the Constitution." Ex parte Royall, 117 U.S. [241, 251, 6 S.Ct. 734, 740 (1886)]. Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the

litigation, have had an opportunity to pass upon the matter." Darr v. Burford, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950). See Duckworth v. Serrano, 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981) (per curiam) (noting that the exhaustion requirement "serves to minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights").

Rose v. Lundy, 455 U.S. 509, 517 (1982) (footnote omitted).

Importantly, in order to exhaust a claim, "state prisoners must give the state courts *one full opportunity* to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan, 526 U.S. at 845 (emphasis added). In Pennsylvania, this requirement means that a petitioner in a non-capital case *must have presented every federal constitutional claim raised in his habeas petition to the Superior Court either on direct or PCRA appeal.* See, e.g., Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004).

The record in this case establishes that Lopez did not raise to the Superior Court the two due process claims at issue here. Because he did not, those claims are procedurally defaulted. See, e.g., Lines, 208 F.3d at 160; Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000). See also Rolan v. Coleman, 680 F.3d 311, 317 (3d Cir. 2012) ("Procedural default occurs when a claim has not been fairly presented to the state courts (i.e., is unexhausted) and there are not additional state remedies available to pursue[.]"). Like the exhaustion doctrine, the doctrine of procedural default is "grounded in concerns of comity and federalism," Coleman, 501 U.S. at 730, and it bars federal habeas review of a claim whenever the petitioner failed to raise it in compliance with a state's procedural rules. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wainwright v. Sykes, 433 U.S. 72 (1977); Lines, 208 F.3d at 162-69.

Lopez argues that he is "actually innocent," and a petitioner who has procedurally defaulted a claim may escape the consequences of the default of the claim if he presents evidence of "actual

innocence" that is "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" Schlup v. Delo, 513 U.S. 298, 316 (1995). See also House v. Bell, 547 U.S. 518 (2006); Houck v. Stickman, 625 F.3d 88, 93-95 (3d Cir. 2010); Hubbard v. Pinchak, 378 F.3d 333, 339-41 (3d Cir. 2004). It only applies in extraordinary cases where the petitioner demonstrates that a constitutional violation has probably resulted in the conviction of one who is actually innocent. Id.; Hubbard, 378 F.3d at 339-40. "It is known as a 'gateway innocence claim' because it is the gateway through which a petitioner must pass in order to have otherwise barred constitutional claims considered." FEDERAL HABEAS MANUAL § 9B:80.[4]

"In an actual innocence gateway case a petitioner must demonstrate two things before his procedural default will be excused. First, a petitioner must present new, reliable evidence that was not presented at trial. Schlup, 513 U.S. at 324." Houck, 625 F.3d at 93. "Second, a petitioner must show by a preponderance of the evidence, 'that it is more likely than not that *no reasonable juror would have convicted him in the light of the new evidence*.' [Schlup, 513 U.S.] at 327." Houck, 625 F.3d at 93 (emphasis added). Lopez has not met either factor.

Based upon all of the foregoing, Lopez's claim that his due process rights were violated because the trial court and the Commonwealth "falsified" the evidence introduced at his trial should be denied

---

[4]     A stand-alone claim of actual innocence is not cognizable in federal habeas. Albrecht v. Horn, 485 F.3d 103, 121-22 (3d Cir. 2007) (citing Herrera v. Collins, 506 U.S. 390 (1993)). Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004) (quoting Herrera, 506 U.S. at 400); Albrecht, 485 F.3d at 121-22). See also FEDERAL HABEAS MANUAL § 1:60. In Herrera, the Supreme Court left open the possibility that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there was no state avenue open to process such a claim." 506 U.S. at 417. In House v. Bell, 547 U.S. 518 (2006), the Supreme Court once again left open the question of whether a truly persuasive freestanding innocence claim in a capital case would warrant federal habeas relief if no state avenues of relief remain available. See also McQuiggin v. Perkins, — U.S. — , 133 S.Ct. 1924, 1931 (2013). In District Attorney's Office for the Third Judicial District v. Osborne, 557 U.S. 52 (2009), which was a non-capital case in which a state inmate brought an action under 42 U.S.C. § 1983 to compel the State of Alaska to release biological evidence so that it could be subject to DNA testing, the Supreme Court in dicta assumed without deciding that an actual innocence claim could be brought in a federal habeas action, but noted "the high standard any claimant would have to meet" to succeed with such a claim. Id. at 2321 (citing House and Herrera). See also Sistrunk v. Rozum, 674 F.3d 181, 187 n.2 (3d Cir. 2012). Suffice it to say that if indeed a stand-alone actual innocence claim could be brought in a non-capital federal habeas case, there is no evidence whatsoever offered by Lopez that would entitle him to relief on such a claim.

30

because it has no merit. In addition, that claim also can be denied because it is procedurally defaulted. Likewise, Lopez's claim that his due process rights were violated "when the trial court judge read [the] prosecutor's version of criminal charges with instructions and prior to deliberation" should be denied because it is procedurally defaulted.

### C. Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. 28 U.S.C. § 2253 provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. Applying those standards here, jurists of reason would not find it debatable whether each of Lopez's claims should be denied. Accordingly, a certificate of appealability should be denied.

### III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that the petition for a writ of habeas corpus be denied and that a certificate of appealability be denied.

Pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, the petitioner must seek review by the district court by filing objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to do so will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n.7 (3d Cir. 2011).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: January 6, 2014

cc:     The Honorable Maurice B. Cohill
        Senior United States District Judge